**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

ARLEENE DEJESUS, individually and on
behalf of all others similarly situated,

*Plaintiff*,


v.


TRIZETTO PROVIDER SOLUTIONS, LLC,
and COGNIZANT TECHNOLOGY
SOLUTIONS CORPORATION,

*Defendants*.

**Case No.** 4:26-cv-00523


**JURY TRIAL DEMANDED**


**CLASS ACTION COMPLAINT**

Plaintiff Arleene Dejesus ("Plaintiff") brings this Class Action Complaint ("Complaint")

against Defendants TriZetto Provider Solutions, LLC ("TriZetto") and Cognizant Technology

Solutions Corporation ("Cognizant") (collectively "Defendants") as an individual and on behalf of all

others similarly situated, seeking monetary damages, restitution, and/or injunctive relief for the

proposed Class, as defined below. Plaintiff makes the following allegations upon information and

belief, the investigation of her counsel, and personal knowledge or facts that are a matter of public

record.

**INTRODUCTION**

1.      The release, disclosure, and publication of sensitive, private data can be devastating.

Not only is it an intrusion of privacy and a loss of control, but it is a harbinger of identity theft: for

victims of a data breach, the risk of identity theft more than quadruples.[1] A data breach can have grave consequences for victims for years after the actual date of the breach—with the obtained information, thieves can wreak many forms of havoc: open new financial accounts, take out loans, obtain medical services, obtain government benefits, and/or obtain driver's licenses in the victims' names, forcing victims to maintain a constant vigilance over the potential misuse of their information.

2.      Defendant Cognizant is an information technology consulting corporation. As part of its business, Cognizant owns multiple subsidiaries that provide IT services to a broad range of business industries, including the healthcare sector.

3.      Defendant TriZetto is a wholly-owned subsidiary of Cognizant. TriZetto is a healthcare technology service provider that provides revenue management services to physicians, hospitals, and health systems, in addition to operating a claims clearinghouse. According to its website, TriZetto's services "increase efficiencies, uncover missed revenue and maximize reimbursements" for health care systems and providers.[2] "Trizetto handles more than 4 billion payment, enrollment, and claims transactions each year in its capacity as a HIPAA business associate."[3]

4.      As part of their regular business practices, Defendants collect, maintain, and store vast quantities of individuals' personal information, which it obtained through their customers (i.e., health systems, physicians, and insurers), policyholders, and the general public. This data, which is used to facilitate payments between healthcare providers and insurance payers, includes claims and billing records.

5.      On or around October 2, 2025, TriZetto discovered unusual activity in its web portal. The web portal is used by its clients to access TriZetto systems. As part of its investigation into this

---

[1]  Dave Maxfield & Bill Latham, Data Breaches: Perspectives from Both Sides of the Wall, 25 S.C. LAWYER 28-35 (May 2014), https:// https://articlegateway.com.
[2] https://www.trizettoprovider.com/who-we-serve/health-systems
[3] https://www.hipaajournal.com/trizetto-provider-solutions-data-breach/

activity, TriZetto learned on or around November 28, 2025, that its systems had been compromised and that data containing personal information that TriZetto maintained and controlled had been breached by an unauthorized third-party (the "Data Breach"). TriZetto's investigation revealed that its system had been compromised for nearly a year—beginning in November 2024—before the breach was discovered. As a result, hackers were able to access the personal information of more than 3.4 million individuals.[4]

6.       Included in the impacted data was protected personal and health information such as names, addresses, birth dates, Social Security numbers, health insurance numbers, Medicare beneficiary numbers, provider names, health insurer names, primary insured information, and other types of demographic, health, and health insurance information, *i.e.*, Personally Identifiable Information ("PII")[5] and Protected Health Information ("PHI")[6] (together, "Private Information").[7]

7.       On December 9, 2025, more than two months after discovering the data breach, TriZetto began notifying affected healthcare providers, some of whom in turn began notifying affected individuals.[8, 9]

8.       Defendants have a duty to safeguard and protect members' information entrusted to

---

[4] *Id.*

[5] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the subject data breach.

[6] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. Dep't of Health and Human Services (Oct. 25, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html.

[7] Jill McKeon, *HCA Healthcare Suffers Data Breach, 11M Patients Impacted*, Health IT Security (July 10, 2023), https://healthitsecurity.com/news/hca-healthcare-suffers-data-breach.

[8] https://www.hipaajournal.com/trizetto-provider-solutions-data-breach/

[9] *See, e.g.,* https://gardnerhealthservices.org/trizettobreachfaq/

3

them and could have prevented this theft by implementing adequate security measures.

9.      Plaintiff and Class Members entrusted Defendants with and allowed Defendants to collect highly sensitive health and personal information as part of seeking medical treatment. They did so confidently, with the legitimate expectation that Defendants would safeguard that private information.

10.     Plaintiff brings this class action because Defendants collected but failed to secure and safeguard individuals' valuable Private Information.

11.     As a result, at least 3.4 million individuals had their Private Information compromised in the Data Breach. Due to Defendants' failure to protect the consumer information it was entrusted to safeguard, Plaintiff and Class Members suffered a loss of the value of their Private Information, and have been exposed to or are at imminent and significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future.

12.     Defendants' intentional, willful, reckless, unfair, and negligent conduct—failing to prevent the breach, failing to limit its severity, and failing to detect it in a timely fashion—harmed Plaintiff and Class Members uniformly. For this reason, Defendants should pay for monetary damages and appropriate identity theft protection services, as well as reimburse Plaintiff and the Class for the costs caused by Defendants' substandard security practices and failure to timely disclose the same. Plaintiff and the Class are likewise entitled to injunctive and other equitable relief that safeguards their information, requires Defendants to improve their data security significantly, and provides independent, expert oversight of Defendants' security systems.

13.     Defendants have also been unfairly and unjustly enriched because of their improper conduct, such that it would be inequitable for it to retain the benefits conferred upon them by Plaintiff and the Class Members. Plaintiff and Class Members never would have entrusted Defendants with their Personal Information had they known that Defendants would permit unauthorized access to

4

their Personal Information because of Defendants' complete and utter disregard for security safeguards and protocols. Plaintiff would have used other providers.

14. Defendants' failure to safeguard Plaintiff and the Class Members' highly sensitive Private Information as exposed and unauthorizedly disclosed in the Data Breach violates their common law duty and Defendants' implied contract with consumers to safeguard their Private Information.

15. Plaintiff and Class Members now face a lifetime risk of identity theft due to the nature of the information lost, and a diminishment in the value of their private data.

16. Defendants' conduct has injured Plaintiff and Class Members in the following ways: (a) the lost or diminished value of their Private Information; (b) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (c) lost opportunity costs to mitigate the Data Breach's consequences; and (d) emotional distress associated with the loss of control over their highly sensitive Private Information.

17. Defendants' failure to protect consumers' Private Information has harmed and will continue to harm millions of individuals, causing Plaintiff to seek this herein relief.

## PARTIES

18. Plaintiff Arleene Dejesus is a resident of Wood-Ridge, New Jersey.

19. In or around March, 2026, Plaintiff received a letter notifying her that TriZetto had received her PII and PHI from her healthcare provider and that her PII and PHI were implicated in the Data Breach.

20. Plaintiff has no direct relationship with Defendants. Her PII and PHI were provided to Defendants by her healthcare provider as a condition of receiving medical care.

21. Defendant Cognizant Technology Solutions Corporation is a Delaware corporation,

registered to conduct business in New Jersey, with its principal place of business located at 300 Frank W. Burr Boulevard, Teaneck, New Jersey 07666.

22.     Defendant TriZetto Provider Solutions, LLC, is a limited liability company, with its principal place of business located at 3300 Rider Trail S., Earth City, Missouri 63045. TriZetto conducts business in Missouri, New Jersey, and throughout the United States.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative Class Members, and minimal diversity exists because many putative Class Members are citizens of a different state than Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

24.     This Court has personal jurisdiction over Defendants. TriZetto maintains its principal place of business in Earth City, Missouri. TriZetto regularly conducts business in Missouri.

25.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), and (d) because TriZetto—which Cognizant owns and exercises controls over, including in regards to data security policies and practices[10]—maintains its principal place of business within this District and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District.

## FACTUAL ALLEGATIONS

### A.     The Data Breach

26.     In or about November 2024, an unauthorized third-party gained access to Defendants'

---

[10] For example, the Privacy Policy linked to on TriZetto's website directs users to Cognizant's Privacy Notice, available at https://www.cognizant.com/us/en/privacy-notice.

systems and data. For nearly a year, this access went unabated and undiscovered by Defendants.

27.     On or around October 2, 2025, TriZetto discovered unusual activity in its web portal. The web portal is used by its clients—physicians, hospitals, and health systems—to access TriZetto systems. As part of its investigation into this activity, TriZetto learned on or around November 28, 2025, that its systems had been compromised and that data containing personal information that TriZetto maintained and controlled had been breached by an unauthorized third-party.

28.     After discovering the breach, Defendants began an investigation. The investigation revealed that "beginning in November 2024, an unauthorized actor began accessing some historical eligibility transaction reports stored on [Trizetto]'s system, that included certain PHI maintained for healthcare providers." As a result of this breach, hackers were able to access the personal information of more than 3.4 million individuals.[11]

29.     According to Defendants, the breached data includes: "patient and primary insured name, address, date of birth, Social Security number, health insurance member number (which in some instances might be a Medicare beneficiary identifier), health insurer name, primary insured or dependent information, and other demographic, health, and health insurance information."[12]

30.     Defendants claim to have "quickly…t[aken] steps to mitigate the issue," and similarly claim that "[t]he incident was contained the same day [TriZetto] became aware of it and there is no evidence of activity within the [TriZetto] environment by the unauthorized actor since October 2, 2025."[13]

31.     More than two months after discovering unusual activity on TriZetto's web portal, on December 9, 2025, Defendants began notifying their affected customers. "Through its vendor Kroll,

---

[11] *Id.*
[12] https://mm.nh.gov/files/uploads/doj/remote-docs/trizetto-provider-solutions-20260211.pdf
[13] *Id.*

[TriZetto] made available an online portal that allowed customers to review and curate lists of affected persons and associated contact information and to opt-in to [TriZetto]'s offer to provide required notifications."[14] Beginning on or about February 6, 2026—if, and only if, Defendants' customer healthcare providers "accepted [TriZetto]'s offer to provide notifications" to individuals whose data was breached—Defendants began notifying via certified mail a subset of affected individuals of the breach.[15]

32.    As noted above, however, whatever efforts Defendants took to secure their data and subsequently notify affected individuals were far too little, far too late—the hackers had already absconded with everything they wanted during nearly a year's worth of unfettered access to Defendants' systems—and Class members' sensitive data.

**B.    Plaintiff's Data Has Been Accessed and Misused as a Result of the Data Breach**

33.    Plaintiff received notice in March 2026 that her PII and PHI had been improperly accessed and compromised as a result of the Data Breach.

34.    Since November 2024, Plaintiff has received a significant amount of spam phone calls—upwards of 10 per day—soliciting her to take out loans. Plaintiff sends all these calls to voicemail.

35.    In early 2026, Plaintiff noticed fraudulent charges on one of her credit cards. The charges totaled approximately $100. Upon discovering the transactions, Plaintiff closed the card.

36.    Although Plaintiff was eventually notified of the Data Breach after months of delay, her data—including her PHI—has already been compromised and has already been used by third parties engaging in fraudulent activity. Plaintiff continues to face the fallout of Defendants' Data Breach, and Plaintiff worries that her children's PII and PHI may have also been stolen in the Data

---

[14] *Id.*
[15] *Id.*

Breach.

**C.      Defendants Failed to Comply with Regulatory Requirements and Industry Practices**

37.      The Federal Trade Commission ("FTC") has issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[16]

38.      In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[17] The guidelines note businesses should protect the personal customer information that they keep; properly dispose of PII/PHI that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

39.      The FTC also recommends that companies not maintain PII/PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[18]

---

[16] *Start With Security*, Federal Trade Commission, at 2, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited March 2, 2020).

[17] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission, https://www.ftc.ov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited March 2, 2020).

[18] *See* FTC, *Start With Security*, *supra* n.16.

40.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

41.    The FTC has interpreted Section 5 of the FTC Act to encompass failures to appropriately store and maintain personal data. The body of law created by the FTC recognizes that failure to restrict access to information[19] and failure to segregate access to information[20] may violate the FTC Act.

42.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data (i.e., PII/PHI) constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

43.    Further, Defendants are required to comply with the HIPAA Privacy Rules, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. The Privacy Rule and the Security Rule set the nationwide standards for protecting health information, including health information stored electronically.

44.    The Security Rule requires Defendants to do the following:

a.    Ensure the confidentiality, integrity, and availability of all electronic protected health

---

[19] *In re Labmd, Inc*, No. 9357, 2016 WL 4128215, at 15 (F.T.C. July 28, 2016) ("Procedures should be in place that restrict users' access to only that information for which they have a legitimate need.").
[20] *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 258 (3d Cir. 2015) (companies should use "readily available security measures to limit access between" data storage systems).

10

information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.[21]

45. Pursuant to HIPAA's mandate that Defendants follow "applicable standards, implementation specifications, and requirements . . . with respect to electronic protected health information," 45 C.F.R. § 164.302, Defendants were required to, at minimum, to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(e), and "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

46. Defendants are also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

47. Both HIPAA and HITECH obligate Defendants to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of sensitive patient PII. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. §17902. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Private Information or to comply with applicable industry standards

---

[21] *Summary of the HIPAA Security Rule*, U.S. Dep't of Health and Human Services (Oct. 19, 2022), https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html.

constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

48.    Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information of patients; Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly egregious given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class Members.

49.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

50.    The hackers accessed and acquired files in Defendants' computer systems containing Private Information of Plaintiff and Class Members, including their name, address, date of birth, Social Security number, health insurance member number (which in some instances might be a Medicare beneficiary identifier), health insurer name, primary insured or dependent information, and other demographic, health, and health insurance information. Plaintiff's and Class Members' Private Information was accessed and stolen in the Data Breach.

51.    Defendants retain and store this information and derive a substantial economic benefit from the Private Information that they collect. But for the collection of Plaintiff's and Class Members' Private Information, Defendants would be unable to provide their services.

52.    By obtaining, collecting, and storing the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

53.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality

of their Private Information and relied on Defendants to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

54. Defendants could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

55. Upon information and belief, Defendants (in part through healthcare providers) made promises to Plaintiff and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

56. For example, Cognizant represents on its website that it "implements appropriate security measures designed to prevent unlawful or unauthorized processing of personal information and accidental loss of or damage to personal information. The data collected via our Sites is stored in a secure server with our ISP who will take periodic backups of such data."[22]

57. Defendants' negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

### D.    Defendants' Knowledge of Cyber Security Threats

58. Defendants knew or should have known of the risk of a cyberattack, because healthcare entities in possession of private information are particularly susceptible to cyberattacks.

59. Data thieves regularly target entities in the healthcare industry like Defendants due to the highly sensitive information that they maintain. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

---

[22] https://www.cognizant.com/us/en/privacy-notice

13

60.     Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities—like Defendants—that collect and store Private Information and other sensitive information, preceding the date of the Data Breach. Between 2020 and 2021, attacks on the healthcare industry increased 71%, making it the fifth most common industry targeted by cyberattacks.[23]

61.     In light of recent high profile data breaches at other industry-leading companies, including, e.g., Trinity Health (3.3 million patients, May 2020); Shields Healthcare Group (2 million patients, March 2022); Community Health Systems (1.2 million patients, January 2023); PharMedica (4.8 million patients, March 2023); Regal Medical Group (3.3 million patients, December 2022); Harvard Pilgrim Healthcare (2.5 million patients, April 2023), Defendants knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.[24]

62.     The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[25]

63.     Entities in custody of PHI reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach. In fact, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare

---

[23] Check Point Research Team, *Check Point Research: Cyber Attacks Increased 50% Year over Year*, Check Point (Jan. 10, 2022), https://blog.checkpoint.com/security/check-point-research-cyber-attacks-increased-50-year-over-year.

[24] For example, of the 1,862 recorded data breaches in 2021, 330 of them, or 17.7%, were in the medical or healthcare industry. *See 2021 Data Breach Annual Report*, ITRC, at 6 (Jan. 2022), https://notified.idtheftcenter.org.

[25] *Id.*

they did not receive in order to restore coverage.[26] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the victims were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.[27]

64.    Despite the prevalence of data breaches and data security compromises in the health care industry, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

65.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on their server(s), amounting to *millions* of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

66.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

67.    The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

68.    As an entity in possession of Patients' Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if their data security systems were

---

[26] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims.
[27] *Id.*

breached. This includes the significant costs imposed on Plaintiff and Class Members because of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach.

E.    **Defendants Had and Breached a Duty to Safeguard Plaintiff and Class Members' Private Information That They Chose to Collect and Keep.**

69.    Defendants owed Plaintiff and Class Members a duty to safeguard their private information.

70.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision- making.

71.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

72.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

73.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

74.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate

16

measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

75.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

76.    Defendants failed to properly implement basic data security practices.

77.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII and PHI it was in possession of or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

78.    Upon information and belief, Defendants were at all times fully aware of its obligation to protect the PII and PHI it was in possession of. Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

79.    In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the Private Information of Class Members.

80.     Defendants owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training their employees and others who accessed Private Information within their computer systems on how to adequately protect Private Information.

81.     Defendants owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

82.     Defendants owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

83.     Defendants owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

84.     Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

**F.     The Data Breach Caused Harm to Plaintiffs and the Class**

85.     The exponential cost to Plaintiff Dejesus and Class Members resulting from the Data Breach cannot be overstated. Criminals can use victims' Private Information to open new financial accounts, incur charges in credit, obtain government benefits and identifications, fabricate identities, and file fraudulent tax returns well before the person whose PII and PHI was stolen becomes aware

of it.[28] Any one of these instances of identity theft can have devastating consequences for the victim—causing years of often irreversible damage to their credit scores, financial stability, and personal security.

86.     According to a *Reuters* investigation that included interviews with nearly a dozen healthcare executives, fraudsters commonly use stolen medical and protected health data "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[29]

87.     Defendants were or should have been aware that they were collecting highly valuable data, which has increasingly been the target of data breaches in recent years.

88.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

89.     Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit from their

---

[28] *See, e.g.*, *Report to Congressional Requesters*, United States Government Accountability Office (June 2007), http://www.gao.gov/assets/270/262899.pdf; Melanie Lockert, *How do hackers use your information for identity theft?*, CreditKarma (Oct. 1, 2021), https://www.creditkarma.com/id-theft/i/how-hackers-use-your-information; Ravi Sen, *Here's how much your personal information is worth to cybercriminals – and what they do with it*, PBS (May 14, 2020), https://www.pbs.org/newshour/science/heres-how-muchyour-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it; Alison Grace Johansen, *4 Lasting Effects of Identity Theft*, LifeLock by Norton (Feb. 4, 2021), https://lifelock.norton.com/learn/identity-theft-resources/lasting-effects-ofidentity-theft.

[29] Jim Finkle, *Your medical record is worth more to hackers your credit card*, Reuters (Sept. 24, 2014), https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924.

19

misfortune.

***Diminution of Value of Private Information.***

90.      Private Information is valuable property.[30] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

91.      The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements.

92.      This type of data commands a much higher price on the dark web. As Martin Walter, senior director at cybersecurity firm RedSeal, explained: "Compared to credit card information, personally identifiable information … [is] worth more than 10x on the black market."[31]

93.      An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[32] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[33] Consumers

---

[30] *See Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*" at 2, U.S. Government Accountability Office (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[31] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem- hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[32] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last accessed July 11, 2023).

[33] David Lazarus, Column: *Shadowy data brokers make the most of their invisibility cloak*, Los Angeles Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

who agree to allow the startup Caden to track their online habits can receive up to $50 a month.[34]

94.     As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

95.     The fraudulent activity resulting from the Data Breach and harming Class Members may not come to light for years.

96.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

97.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on their network, amounting to millions of individuals' detailed Private Information and thus the significant number of individuals who would be harmed by the exposure of the unencrypted data.

98.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

99.     As a result of the recognized risk of identity theft, when a data breach occurs and an

---

[34] Wilfred Chan, *This startup hopes to pay users $50 a month to sell companies their data*, Fast Company (Mar. 21, 2023), https://www.fastcompany.com/90865694/caden-hopes-to-pay-users-50-dollars-a-month-to-sell-companies-their-data.

21

individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

100.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the severity of the Data Breach upon receiving their Notice Letters.

101.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[35]

102.    Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[36]

103.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and

---

[35] *See* GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. Government Accountability Office (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[36] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last accessed July 23, 2023).

will continue to incur such damages in addition to any fraudulent use of their Private Information.

104.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' network, amounting to millions of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

105.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

### Impact Of Identity Theft Can Have Ripple Effects

106.    Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, in addition to the irreparable damage that may result from the theft of a social security number, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[37]

107.    And, the impact of identity theft can have ripple effects, which can adversely affect the future financial trajectories of victims' lives. For example, the Identity Theft Resource Center reports that respondents to their surveys in 2013-2016 described that the identity theft they experienced affected their ability to get credit cards and obtain loans such as student loans or mortgages.[38] For some victims, this could mean the difference between going to college or not, becoming a homeowner

---

[37] U.S. Dep't of Justice, *Victims of Identity Theft, 2014* (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

[38] *Identity Theft: The Aftermath 2017*, Identity Theft Resource Center, https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (last visited July 27, 2023).

or not, or having to take out a high interest payday loan versus a lower-interest loan.

108.    It is no wonder then that identity theft exacts a severe emotional toll on its victims.

109.    The 2017 Identity Theft Resource Center survey[39] evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed

- 67% reported anxiety

- 66% reported feelings of fear related to personal financial safety

- 37% reported fearing for the financial safety of family members

- 24% reported fear for their physical safety

- 15.2% reported a relationship ended or was severely and negatively impacted by the identity theft

- 7% reported feeling suicidal.

110.    Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances

- 37.1% reported an inability to concentrate / lack of focus

- 28.7% reported they were unable to go to work because of physical symptoms

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues)

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[40]

111.    There may also be a significant time lag between when PII/PHI is stolen and when it

---

[39] *Id.*
[40] *Id.*

24

is actually misused. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> **[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[41]**

112.    As the result of the Data Breach, Plaintiff and Class Members have suffered and/or will suffer or continue to suffer economic loss, a substantial risk of future identity theft, and other actual harm for which they are entitled to damages, including, but not limited to, the following:

- losing the inherent value of their Private Information;

- losing the value of Defendant's implicit promises of adequate data security;

- identity theft and fraud resulting from the theft of their Private Information;

- costs associated with the detection and prevention of identity theft and unauthorized use of their medical and health insurance information;

- costs associated with purchasing credit monitoring and identity theft protection services;

- unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

- lowered credit scores resulting from credit inquiries following fraudulent activities;

- costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance and

---

[41] *See,* GAO, *Report to Congressional Requesters, supra,* n.28.

25

annoyance of dealing with the repercussions of the Data Breach; and

- the continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their Private Information being in the possession of one or many unauthorized third parties.

113.   Additionally, Plaintiff and Class Members place significant value in data security.

114.   Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, companies like Defendants would have no reason to tout their data security efforts to their actual and potential customers.

115.   Consequently, had consumers known the truth about Defendants' data security practices—that Defendants would not adequately protect and store their data—they would not have entrusted their Private Information to Defendants, utilized health services that relied on Defendants' services, or paid as much for such services or benefits.

## CLASS ACTION ALLEGATIONS

116.   Pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4), Plaintiff brings this action on behalf of herself and on behalf of all members of the following Class and Subclass:

**Nationwide Class:**

All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach.

**New Jersey Subclass:**

All individuals whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach, and who resided in New Jersey at the time of the Data Breach.

117.   Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants

26

have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

118.    Plaintiff reserves the right to amend the definition of the Class or add a Class or Subclass if further information and discovery indicate that the definition of the Class should be narrowed, expanded, or otherwise modified.

119.    **Numerosity**: The members of the Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, upon information and belief, more than 3.4 million individuals are affected by the Data Breach. Those individuals' names and addresses are available from Defendants' records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods. Joinder of all Class Members is impracticable.

120.    **Commonality**: This action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a.    Whether Defendants had a duty to protect the Plaintiff's and the Class Members' Private Information;

b.    Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting and storing their Private Information;

c.    Whether Defendants failed to take reasonable and prudent security measures;

d.    Whether Defendants were negligent in failing to implement reasonable and adequate security procedures and practices;

e.    Whether Defendants' security measures to protect their systems were reasonable in light of known legal requirements;

f.    Whether Defendants' efforts (or lack thereof) to ensure the security of individuals' Private Information were reasonable in light of known legal

27

requirements;

g.   Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

h.   Whether Defendants' conduct constituted unfair or deceptive trade practices;

i.   Whether Defendants' failure to institute adequate security measures amounted to breach of an implied contract;

j.   Which security procedures and notification procedures Defendants should be required to implement;

k.   Whether Defendants violated state consumer protection and data breach statutes in connection with the actions described herein;

l.   Whether Defendants failed to notify Plaintiff and Class Members as soon as practicable and without delay after the Data Breach was discovered;

m.   Whether Defendants' conduct, including their failure to act, resulted in or was the proximate cause of the Data Breach and/or the loss of the Private Information of Plaintiff and Class Members;

n.   Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Defendants' failure to reasonably protect their Private Information; and

o.   Whether Plaintiff and Class Members are entitled to damages or injunctive relief.

121.   **Typicality:** Plaintiff's claims are typical of those of the other Class Members because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

122.   This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making

28

final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

123. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intends to prosecute this action vigorously.

124. **Superiority**: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that millions of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

125. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the

costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

126. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

127. Further, Defendants have acted on grounds that apply generally to the Class as a whole, such that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

## CAUSES OF ACTION

### COUNT 1
### NEGLIGENCE
### On Behalf of Plaintiff and the Nationwide Class

128. Plaintiff repeats and alleges the factual allegations above as if fully set forth herein.

129. Defendants acquired, maintained, and profited from Plaintiff's and Class Members' sensitive Private Information. Defendants owed a duty to Plaintiff and Class Members—arising from the sensitivity of the information, the expectation the information was going to be kept private, and the foreseeability of their data safety shortcomings resulting in an intrusion—to exercise reasonable care in safeguarding their sensitive personal information. This duty included, among other things, designing, implementing, maintaining, monitoring, and testing Defendants' networks, systems, protocols, policies, procedures, and practices to ensure that Plaintiff's and Class Members' information was adequately secured from unauthorized access.

130. Defendants had common law duties to prevent foreseeable harm to Plaintiff and Class Members. These duties existed because Plaintiff and Class Members were the foreseeable and probable

victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiff and Class Members would be harmed by the failure to protect their Private Information because hackers routinely attempt to steal such information and use it for nefarious purposes, but Defendants also knew that it was more likely than not Plaintiff and other Class Members would be harmed by such theft.

131.    Defendants are covered by HIPAA (45 C.F.R. § 160.102) and thus required to comply with the HIPAA Privacy Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

132.    Defendants owed a duty to Plaintiff and Class Members to implement administrative, physical, and technical safeguards, such as intrusion detection processes that detect data breaches in a timely manner, to protect and secure Plaintiff's and Class Members' Private Information.

133.    Defendants also had a duty to monitor, supervise, control, or otherwise provide oversight to safeguard the Private Information that was collected and stored on their servers.

134.    Defendants owed a duty to disclose the material fact that their data security practices were inadequate to safeguard Plaintiff's and Class Members' Private Information.

135.    Defendants also had independent duties under Plaintiff's and Class Members' state laws that required Defendants to reasonably safeguard Plaintiff's and Class Members' PII and PHI, and promptly notify them about the Data Breach.

136.    Defendants had a special relationship with Plaintiff and Class Members as a result of being entrusted with their Private Information, which provided an independent duty of care. Plaintiff's and Class Members' willingness to entrust Defendants with their Private Information was predicated on the understanding that Defendants would take adequate security precautions. Moreover,

31

Defendants were capable of protecting their networks and systems, and the PII and PHI it stored on them, from unauthorized access.

137.     Defendants breached their duties by, among other things: (a) failing to implement and maintain appropriate data security practices to safeguard Plaintiff's and Class Members' Private Information, including administrative, physical, and technical safeguards; (b) failing to detect the Data Breach in a timely manner; and (c) failing to disclose that their data security practices were inadequate to safeguard Plaintiff's and Class Members' Private Information.

138.     But for Defendants' breach of their duties, including the duty to use reasonable care to protect and secure Plaintiff's and Class Members' Private Information, Plaintiff's and Class Members' Private Information would not have been accessed by unauthorized parties.

139.     Plaintiff and Class Members were foreseeable victims of Defendants' inadequate data security practices. Defendants knew or should have known that a breach of their data security systems would cause damage to Plaintiff and Class Members.

140.     It was reasonably foreseeable that the failure to reasonably protect and secure Plaintiff's and Class Members' Private Information would result in unauthorized access to Defendants' networks, databases, and computers that stored or contained Plaintiff's and Class Members' Private Information.

141.     As a result of Defendants' negligent failure to prevent the Data Breach, Plaintiff and Class Members suffered injury, which includes, but is not limited to, exposure to a heightened and imminent risk of fraud, identity theft, and financial harm. Plaintiff and Class Members must monitor their financial accounts and credit histories more closely and frequently to guard against identity theft. Plaintiff and Class Members have also incurred, and will continue to incur on an indefinite basis, out-of-pocket costs for obtaining credit reports, credit freezes, credit monitoring services, and other protective measures to deter and detect identity theft. The unauthorized acquisition of Plaintiff's and

Class Members' Private Information has also diminished the value of the Private Information.

142. The harm to Plaintiff and Class Members was a proximate, reasonably foreseeable result of Defendants' breaches of their aforementioned duties.

143. Therefore, Plaintiff and Class Members are entitled to damages in an amount to be proven at trial.

**COUNT 2**
**NEGLIGENCE *PER SE***
**On Behalf of Plaintiff and the Nationwide Class**

144. Plaintiff repeats and alleges the factual allegations above as if fully set forth herein.

145. Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and appropriate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

146. In addition, under state data security statutes, Defendants had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and Class Members' Private Information.

147. Defendants breached their duties to Plaintiff and Class Members, under the FTC Act and the state data security statutes, by failing to provide fair, reasonable, or appropriate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

148. Defendants are covered by HIPAA (45 C.F.R. § 160.102) and are required to comply with the HIPAA Privacy Rule, 45 C.F.R Part 160 and Par108501t 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. HIPAA prohibits unauthorized disclosures of "protected health information," which includes the information at issue here.

149. Plaintiff and Class Members were foreseeable victims of Defendants' violations of the

33

FTC Act, HIPAA, and state data security statutes. Defendants knew or should have known that the failure to implement reasonable measures to protect and secure Plaintiff's and Class Members' Private Information would cause damage to Plaintiff and Class Members.

150.    Defendants' failure to comply with the applicable laws and regulations constitutes negligence per se.

151.    But for Defendants' violation of the applicable laws and regulations, Plaintiff's and Class Members' Private Information would not have been accessed by unauthorized parties.

152.    As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injuries and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**COUNT 3**
**BREACH OF IMPLIED CONTRACT**
**On Behalf of Plaintiff and the Nationwide Class**

153.    Plaintiff repeats and alleges the factual allegations above as if fully set forth herein.

154.    Defendants—through their customers—provided services to Plaintiff and Class Members in exchange for payment.

155.    Defendants also required Plaintiff and the Class Members to provide Defendants— through Plaintiff's and Class Members' healthcare providers—with their Private Information to receive medical care.

156.    Accordingly, Defendants impliedly promised to protect Plaintiff's and Class Members' Private Information through adequate data security measures.

157.    Plaintiff and the Class Members accepted Defendants' offer by providing Private Information to their healthcare providers who in turn provided it to Defendants in exchange for receiving Defendants' services, and then by paying for and receiving the same.

158.    Plaintiff and Class Members would not have entrusted their Private Information to

Defendants but for the above-described agreement with Defendants.

159.    Defendants materially breached their agreements with Plaintiff and Class Members by failing to safeguard such Private Information, violating industry standards necessarily incorporated in the agreement.

160.    Plaintiff and Class Members have performed under the relevant agreements.

161.    The covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms.

162.    Defendants' conduct as alleged herein violated this implied covenant of good faith and fair dealing inherent in every contract.

163.    The losses and damages Plaintiff and Class Members sustained as described herein were the direct and proximate result of Defendants' breach of the implied contracts with them, including breach of the implied covenant of good faith and fair dealing.

## COUNT 4
### Violation of New Jersey Consumer Fraud Act ("NJCFA")
### (N.J.S.A. §§ 56:8-1, et seq.)
### On Behalf of Plaintiff and the New Jersey Subclass

164.    Plaintiff repeats and alleges the factual allegations above as if fully set forth herein.

165.    The NJCFA makes certain acts unlawful for persons engaged in any commercial practice. N.J. Stat Ann. § 56:8-2 (West 2022). Violating New Jersey's data breach notice statute is an unlawful practice under the NJCFA. N.J. Stat. Ann. § 56:8-160 (West 2005). Violating New Jersey's Identity Threat Prevention Act is also an unlawful practice under the NJCFA. N.J. Stat. Ann. § 56:11-44–§ 56:11-52 (West 2006).

166.    The notice statute requires "any business that conducts business in New Jersey, or any public entity that compiles or maintains computerized records that include personal information" to

35

provide notice without unreasonable delay to New Jersey residents "whose personal information was, or is reasonably believed to have been, accessed by an unauthorized person." N.J. Stat. Ann. § 56:8-163(a) (West 2019).

167.    Defendants are businesses that compile and maintain computerized records that contain personal information as defined in N.J. Stat. Ann. § 56:8-161 (West 2019). Defendants, therefore, were required to disclose to Plaintiff and New Jersey Subclass Members the existence of the Data Breach without unreasonable delay.

168.    Defendants became aware of the Data Breach as early as October 2, 2025 and no later than November 28, 2025, but failed to provide the required written notice to Plaintiff and the New Jersey Subclass Members.

169.    Plaintiff and the New Jersey Subclass Members did not know they were impacted by the Data Breach until they received direct notice from TriZetto months after the Data Breach. That notice is insufficient under New Jersey law.

170.    As a direct and proximate result of Defendants' inadequate security measures and the resulting Data Breach, Plaintiff and the New Jersey Subclass Members suffered and will continue to suffer injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) uncompensated value of their PII; (iv) lost time associated with attempting to mitigate the actual consequences of the Data Breach; (v) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vi) actual misuse of the compromised data; (vii) nominal damages; and (viii) the continued risk to their PII, which remains (a) unencrypted and available for unauthorized third parties to access and abuse; and (b) backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Salesforce fails to undertake appropriate and adequate measures to protect their PII.

171.    Plaintiff and the New Jersey Subclass Members seek all monetary and nonmonetary

36

relief allowed by law, including any economic damages; nominal damages; enhanced or treble damages available under the law; court costs; reasonable and necessary attorneys' fees; injunctive relief; and any other relief available by law and that the Court deems proper.

## **REQUEST FOR RELIEF**

172.    WHEREFORE Plaintiff, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a.    permanent declaratory and injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

b.    compensatory, consequential, and general damages in an amount to be determined at trial;

c.    disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices, in amounts to be determined at trial;

d.    statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

e.    costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

f.    pre- and post-judgment interest at the maximum legal rate; and

g.    all such other relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: April 8, 2026

Respectfully submitted,

*/s/ Amber L. Schubert*
Amber L. Schubert (*pro hac vice*)
**SCHUBERT JONCKHEER &
KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: 415-788-4220
Fax: 415-788-0161
aschubert@sjk.law


Sabita J. Soneji (*pro hac vice*
forthcoming)
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, CA  94612
Telephone: (510) 254-6808
Email: ssoneji@tzlegal.com

*Counsel for Plaintiff and the Proposed Class*